Isaac Rowe and Jacob Rowe *v.* John B. Matteson and David Hill, Administrators, with the Will of Betsey Hoagland, deceased, annexed, and Kitty Weart.

On a bill of interpleader the first decree is that the defendants interplead, and the case then becomes a case between the defendants as between a complainant and defendant.

A. gave a bond to B. B. died leaving a will and appointing executors; on the death of B., C. took possession of the bond, claiming that B., in her lifetime, had by parol transferred it to her, the said C.; and notified the obligors not to pay the bond to the said executors, and that it was her property and in her possession, and that she should sue the obligors. The executors gave notice to the obligors not to pay the bond to C., and that they should sue if it was not paid to them; and afterwards commenced an action at law against the obligors, and declared upon the bond as a lost bond. The obligors filed a bill against the executors and C., praying that they should interplead, and praying an injunction restraining them from proceeding at law. The injunction was allowed.

The answers admitted the facts on which the prayer for interpleader was founded, the answer of C. setting forth the grounds of her claim to the bond. No decree was taken against the defendants to interplead; but the proofs on both sides, as between the defendants, were taken and the cause brought to hearing; and it being ready for a decision, both as between the defendants and as between them and the complainants, it was heard and a final decree made.

The Court said that C. held the affirmative and was entitled to the opening and reply.

In equity there may be such an agreement by parol as will pass the right to a chose in action; but the proof of the agreement should be clear. The proof in this case was held insufficient.

On the 1st of April 1843, Isaac Rowe, with Jacob Rowe as his surety, gave a bond of that date to Betsey Hoagland, since deceased, conditioned for the payment of $1500 in one year with interest.

On the second day of July 1844, Betsey Hoagland died, leaving a will, and administration with the said will annexed was granted to John B. Matteson and David Hill.

The said Rowe bond is in the possession of Kitty Weart; and she, on the 17th of March 1845, by notice in writing served on the said Isaac and Jacob Rowe, forbade them from paying the said bond to the administrators of Betsey Hoagland, deceased, stating in the said notice that the said bond was delivered and

transferred to her the said ,Kitty Weart for a valuable conside-
ration, by the said Betsey Hoagland in her lifetime, and that it
was the property of her the said Kitty and in her possession;
and that it was her intention to institute legal proceedings
against the said Rowes for the recovery from them of the amount
due on the said bond.

On the first of May 1845, the administrators &c. of Betsey
Hoagland, deceased, by notice in writing served on the said
Isaac and Jacob Rowe, forbade them from paying the said bond
to the said Kitty Weart, and demanded that it be paid to them;
stating in the said notice that it was the property of the said
Betsey Hoagland, deceased, and belonged to her estate, and that
unless it was paid to them they should institute legal proceedings
against the Rowes for the recovery thereof.

After the service of the last mentioned notice, the said admin-
istrators commenced an action of debt against the Rowes, on the
bond, and declared upon it as a lost bond.

The Rowes then filed a bill of interpleader stating that they
have always been and now are ready to pay the said bond, and
offering to pay it to such person as the Court shall direct, and
praying that the said administrators &c. of Betsey Hoagland
and the said Kitty Weart may interplead; and that in the mean
time they may be restrained from proceeding at law against
them.

The injunction was allowed.

Answers were put in by Kitty Weart and the administrators
&c. of Betsey Hoagland, deceased.

The answer of Kitty Weart states that Betsey Hoagland was
twice married, first to David Stout, and after his death to John
Hoagland, who died in August 1842. That after Hoagland's
death the said Betsey, being advanced in years and infirm, and
having no children and but one brother, who lived in the State
of New-York, and being an aunt of her the said Kitty, she the
said Kitty shortly after the death of the said Hoagland invited
the said Betsey to make her house her home; and that in com-
pliance with such invitation the said Betsey did, about two

months after the death of the said Hoagland, remove from Readington, Hunterdon County, where she had resided, to the house of her the said Kitty in the township of Hopewell, bringing with her her goods, furniture and whatever articles of property she possessed. That at or about the time of such removal she informed the said Kitty that she had a claim against John S. Hoagland, the son of her late husband, of about $1700, which she believed and expected would some day be paid or secured to her. And that the said Betsey proposed to her that she should permit the said Betsey to live with her as one of her family, during her life, and that as a compensation therefor she said Kitty should have whatever the said Betsey might realize out of the said claim. That she the said Kitty, in consequence of her connexion with the family had before heard of the said claim, and was satisfied it was just and might be enforced; and that she might avail herself of the benefit of it. That she therefore acceded to the proposal which had been made to her, and agreed with the said Betsey that in consideration of the said claim and of the amount that might be collected thereon, she would take care of the said Betsey and provide for her during her life. That in pursuance of this agreement she did from that time forward continue to take care of and provide for the said Betsey, the said Betsey occupying a part of her house and living in her family.

That in the spring of 1843 the said claim was adjusted between the said Betsey and the said John S. Hoagland. That for the interest which had accrued thereon, amounting to between $800 and $900, the said J. S. H. gave to the said Betsey his note; and for the principal of said claim paid to the said Betsey $200 in cash, and for the residue of the principal, by an arrangement made between the said J. S. H. and the said Rowes, the said bond of the Rowes conditioned for the payment of $1500, was given to the said Betsey.

That after the said Betsey had received the said bond, she expressly stated to this defendant in the presence of witnesses that this bond, with all the moneys that might be due thereon, was to be her property, in pursuance of the agreement originally made with her, provided she continued to take care of

her the said Betsey and provide for her during her life. That the same assurances were frequently made to this defendant by the said Betsey at subsequent periods; and the said bond was always spoken of and treated by the said Betsey as the property of this defendant and held in trust for her, subject only to the said conditions. That the said bond was never formally assigned to the said defendant by the said Betsey; and the reason she gave to this defendant for not doing so was that this defendant might fail to comply with the conditions of the said contract on her part, and thus put the said Betsey to the necessity of looking for a home and finding the means of support elsewhere. That the said Betsey continued to live with this defendant until her death July 2, 1844, being then 76 years old. This answer then states the care, trouble and expense of this defendant in taking care of the said Betsey. That having faithfully fulfilled &c., she considered herself fairly entitled to the said bond; and on the death of the said Betsey regarded it as her property, and accordingly retained it in her possession.

The answer of the administrators &c. of Betsey Hoagland sets forth her will, which gives all her property to Sarah Jane Lewis, and other matters not important for the consideration of the question involved in the case.

The testimony, so far as material, is as follows:—

*Adelia Weart,* for Kitty Weart. She is a daughter of the said Kitty, and will be 20 in July. Mrs. H. was to live with mother her life time for the money she got of John S. Hoagland. Has heard Mrs. H. speak of a claim she had against J. S. H. Has heard her speak of the amount of it. It was $1500. That is the claim she just said her mother was to have for keeping her during her life. The first conversation she recollects to have heard between her mother and Mrs. H. about this matter was about three months after Mrs. H. came there to live. She said, while all were there together, she wished us to remember what she said: she then asked mother if she would be willing to keep her as long as she lived for that money she would get of J.

S. H. Mother replied she would. Gen. Manners, mother, witness and her younger sister were present. She heard this subject referred to frequently by mother and Mrs. H. Has heard Mrs. H. speak of a bond of $1500 as having been received of Isaac and Jacob Rowe in satisfaction of that claim against J. S. H. This bond was frequently referred to and talked about by mother and Mrs. H. Mrs. H. always spoke of this bond as the money mother was to have in pursuance of that agreement.

*Jacob S. Weart,* for Kitty Weart. He is a son of Kitty Weart. On one occasion Mrs. H. sent for David Stout to see about putting out some money she expected to receive from N. Brunswick and upon some small notes from persons in our neighborhood. He came, and aunt (Mrs. H.) said, when speaking of putting out the money, that the bond she intended for mother for keeping her as long as she lived. She referred to the Rowe bond. Witness had heard of this bond before : saw it shortly after aunt got it. On another occasion he heard Mrs. H. say she was going to get this money and was going to give it to mother for keeping her. Heard Mrs H. say the Rowes had given notice that they were going to pay the bond the spring after it was given.

*James S. Manners,* for Kitty Weart. He was present on the occasion related by Miss Weart : it was the latter part of Dec. 1842 or first part of Jan. 1843. Mrs. H. said—now you are all together I want to talk with you or consult with you. She said, I have been talking with Mrs. W. I think she can afford to keep me as long as I live for that money I am to get of John S. Hoagland, if I get it. I rather expect to get it. She then asked witness what he thought of it—whether Mrs. Weart could afford it. Witness told her he thought Mrs. W. could well afford to do it, or words to 'that effect. Mrs. W. replied—yes, aunt, you shall have a home as long as you live, as long as she, Mrs. W. had one. This was all of it. Witness supposed it was a contract unless altered. The bond in question was not then given.

*Jared S. Weart,* for Kitty Weart. He is her son. Was present on the occasion referred to by his sister and Gen. Manners : it was two or three months after Mrs. H. came there. She

came into the room and said she wished all to take notice what she said, and said she had been telling Kitty she thought she could afford to keep her as long as she lived for the money she was to get of John S. Hoagland.  Mother told her she would— she should never want a home as long as she had one.  Remembers her asking Gen. Manners if he did not think she could afford to keep her for that, and he said he thought she could afford to keep her very well.  Never heard Mrs. H. refer to this matter on any other occasion.  Had heard this claim spoken of before in the family by Mrs. H.  The Rowe bond was afterwards taken for this claim.

*Cross-examined.*  Mrs. H. made some presents to mother, but they were all delivered up after a suit was commenced for them.

*George Vlerebome* for the administrators &c. of Betsey Hoagland.  He paid Mrs. H. $200 and interest in May before her death, at the house of Kitty Weart.  Kitty was present when he paid it.  He paid it on the stand, and it was there when he left.  He had borrowed $250 and given her his note for it.  Sometime after that she requested him to draw a new note for the money to Jas. S. Lewis, which he did.  After James' death she requested him to draw a new note for it to herself, which he did.  The said payment was made on this last note. The reason she gave for taking the note to Jas. S. Lewis was that the property was to go there after she had done with it. James T. Manners was at his house after the death of Mrs. H. We talked, among other things, about this bond in dispute. He said that Mrs. H. asked him if Mrs. W. would not be well paid if she got the money coming on this bond.  Witness asked if he thought she meant the principal or the interest. He said he took it that she meant that the interest alone would pay her.

*James S. Wykoff,* for the administrators.  He called to see Mrs. H. shortly before her last illness and saw her.  His object was to get $1 Mrs. H. subscribed towards the erection of a Methodist Church.  She said she expected money, saying from whom; that she wanted it, and wanted to help Kitty a little too,

for she had been very kind to her. Mrs. W. was in the room at the time.

*Mary Lewis,* for the administrators, testifies to a conversation with Mrs. H. in which Mrs. H. said, among other things, that Sarah Jane Lewis, daughter of James Lewis, deceased, would now get more of her property, for she was getting of John S. Hoagland what she expected was lost.

*John B. Matteson,* for the administrators. He was at Mrs. W's. to see Mrs. H. on business. Was there three times in April 1844. He had drawn her will, and had frequent conversations with her about the disposition of her property. At one time she asked him to take the papers and take care of them. They were looking over her papers. The bond was one, the Waldron note another, (and mentioning several others). She wished witness to take the papers and take care of them for the child named in her will. Witness told her they were safe there and she had better keep them herself. She said she believed they were safe, and kept them. Witness paid her at one time $200 in the spring after she moved to Mrs. W's. He got it from John S. Hoagland. He paid Mrs. W's son Jacob $30 for Mrs. H. shortly before her death. At one of his visits to Mrs. H. they made a calculation of the amount she would have to leave to the little girl named in her will, and we made it about $3000. When he paid her the $200 she said it would pay what she owed and leave her $100 to lend to a person she named who wanted it. Thinks she mentioned that she wanted to pay for her board and some little things she wanted to get, but he will not be certain.

*Cross-examined.* She never told him how she was living with Mrs. W. Witness inquired of her about it: she waived the question and did not tell him. When he asked if she would have enough to live on she signified she would have enough of the $200 to pay her board and put out $100. To his question what she paid for board, she replied Mrs. W. and she knew about that, and smiled. He then asked her if she would now have enough to live upon, and she said yes, I shall now have enough to pay my board, and $100 to put out.

*In chief.* This conversation had reference to the $200 he paid her and was at that time. At the time of taking the in-

ventory he demanded the Rowe bond of Mrs. M. She replied that Mrs. H. had made a verbal disposition of it.

*Cross-examined.* Mrs. W. did not say for what consideration Mrs. H. had disposed of it.

*James S. Manners* again called for Kitty Weart. He remembers the conversation alluded to with Vlerebome. Witness's object in going to Vlerebome's was to collect testimony to support the caveat against Mrs. H's will. If the will had been set aside he would have been one of the heirs. Vlerebome said Mrs. W. claimed the bond under a contract to keep Mrs. H., as he understood.' Witness told V. he heard Mrs. W. claimed the bond, and it was very probable there had been a contract between them, and then assigned his reasons for thinking so ; that in the latter part of Dec. or beginning of January, after Mrs. H. moved to Mrs. W's., Mrs. H. said something like this:—now we are all together I want to talk with you, or something to that effect; said she, I have been telling Kitty that if I get that money of John S. Hoagland I think she can afford to keep me as long as I live for it. She then appealed to witness and said don't you think she can? Witness replied he thought she could very well, or something to that effect. Either Vlerebome or Stout asked witness if he supposed she meant the principal or interest. His remark was that he supposed either would have paid her. The bond in question was not then in existence. Witness referred to the money due Mrs. H. from J. S. H. When he said that either principal or interest would pay, he meant to get round the question. He did not mean to make evidence to break his own head. In the conversation between Mrs. H. and Mrs. W. nothing was said about interest or principal. It was that money of J. S. H. if she got it, and she was then encouraged to think she would get it.

The counsel differed as to who was entitled to the opening and reply.

The Court said it was on Kitty Weart to maintain the affirmative of her proposition, that the bond by parol agreement became hers.

*R. S. Field* and *W. Halsted* for Kitty Weart. They cited 1 *Greenl. Evid.* 514 ; 1. *Mad. Ch.* 443,4; 4 *Taunt. Rep.* 326 ; 1 *Ves.* 332 ; 1 *Hill's S. C. Rep.* 187 ; 4 *Tenn. Rep.* 690 ; 1 *Chit. Gen. Pr.* 106 ; 19 *John. Rep.* 342 ; 16 *Ib.* 51 ; 15 *Mass.* 485 ; 2 *Cond. Eng. Ch.* 410, 411 ; 3 *Ib.* 699 ; 1 *Ves. Sen.* 348 ; 2 *Story's Eq. Sec.* 1055, 1057*a*, 1047 ; 11 *Price* 110 ; 3 *Swanst.* 393.

*S. R. Hamilton* and *P. D. Vroom* for the administrators &c. of Betsey Hoagland. They cited 2 *Kent's Com.* 438, 9 ; 2 *John. Rep.* 52 ; 9 *Law. Lib.* 15, 68, 126, 134 ; 1 *Mad. Ch.* 383 ; 1 *Peter's* 380 ; 12 *Ves.* 37.

THE CHANCELLOR. On a bill of interpleader there should, regularly, be a decree that the defendants interplead, and the case then becomes a case between the defendants, as between a complainant and defendant. But as the proofs have been taken on both sides as between the defendants, and the cause is brought to hearing and is ready for a decision, both as between the defendants and as between them and the complainants, it may now be heard and a final decree made.

On the merits of the case I think it was a proper case for a bill of interpleader and for the injunction which was granted. In equity there may be such an agreement by parol as will pass the right to a chose in action. As between the defendants I have only to remark, that the proof of such agreement should be clear, and that I think the proof in this case insufficient.

Decree for the executors.